### The People on relation of Aldert Plugger and others v. The Township Board of Overyssel.

The law will not permit an agent to act for himself and his principal in the same transaction: as to buy of himself as agent the property of his principal; and the like. Per MANNING J.

Public officers are agents within this rule. Per MANNING J.

Where persons were authorized to act on behalf of certain townships in letting a contract for the improvement of a harbor, with power in regard to the plan, of the work, the materials to be used, the time and mode of completion security for performance, &c., and a portion of their number, though less than a majority, united with others in taking the contract, the contract was held void.

*Heard April 8th and 9th. Decided April 28th.*

Motion for a mandamus.

The relators, Aldert Plugger, W. J. Mulder, M. D. Howard, Homer Schaddelee, Jan Trimpe, W. K. Fliestra, H. D. Post, P. F. Pfaustiehl, Charles J. Pfaff and John Roost, set forth in their application:

That in pursuance of "An act to authorize the township of Holland and other townships in the counties of Ottawa and Allegan, to make loans and levy taxes for the improvement of the harbor at the mouth of North Black River in Ottawa County," approved February 8, 1858, the townships of Holland, Zealand, Overyssel and Fillmore,

voted respectively for a loan to be expended in improving the entrance from Lake Michigan to Black Lake Harbor, in, the Township of Holland, that is to say: The township of Holland for a loan of twelve thousand dollars, the township of Zealand for a loan of three thousand dollars, the township of Overyssel for a loan of two thousand dollars, and the township of Fillmore for a loan of two thousand dollars.

That subsequent to such votes, the township board of each of the said townships appointed, from year to year, seven freeholders, pursuant to section four of the said act, to act in behalf of such township, and the said seven freeholders appointed for the township of Holland, entered into a contract with one Zindweg, for piers, to improve the entrance to the harbor of said North Black Lake, at a cost of $5000, and the same were constructed and accepted, and the price paid by said township of Holland, out of said sum of $12,000 so voted by it.

That afterwards, on December 23, 1858, the freeholders so appointed by the several townships, and constituting the "Harbor Committee," so called, met to receive proposals for the building of two piers at the mouth of North Black River, in pursuance of public notice previously given by them, and then and there accepted the bid of the relators, which was the lowest bid therefor, at the sum of $14,000, and a contract was accordingly made by said committee with the relators, for the construction of such piers by the first day of September, 1860, under the direction of overseers to be appointed by the boards of freeholders of the several towns, and in accordance with plans and specifications made a part of the contract, at the price of $14,000, being the whole total voted by said townships, after deducting the $5,000 so expended by the township of Holland.

That the work, under said contract, was performed and completed by the relators in the fall of 1861, to which time the contract had been extended; but, that the said boards

of freeholders of Zealand, Overyssel and Fillmore, could not be induced to meet with the board of freeholders of Holland, to determine upon the acceptance of the same, and the said board of freeholders of Holland, on January 13, 1862, approved and accepted the work as completed under the contract, and certain modifications of the same which had been agreed upon.

That the township of Holland has paid seven thousand dollars upon said contract, and the township of Zealand eighteen hundred dollars, but that the townships of Overyssel and Fillmore have paid nothing, and the respective township boards now refuse to pay, or to issue bonds for the amount so voted by them respectively; and the township board of Zealand refuse to pay or issue bonds for the balance of $1,200, so voted by that township.

The relators then set forth a demand upon the township boards of the respective delinquent towns, for the issue to them of bonds for the respective sums so voted, and the refusal of the boards to issue the bonds in compliance with the demand. And they now move for a mandamus directed to the township board of Overyssel, to compel the issue of bonds for $2,000 by them.

The township board showed cause, alleging the original invalidity of the contract, for want of power in the Harbor Committee to contract under said act, and because four of the said board of freeholders of the township of Holland, at the time the contract was entered into, were among the contractors for doing the work. They aver, upon belief, that the work was never fully executed, and say that if ever accepted, it was by the contractors themselves. Other matters of defense, not necessary to be here mentioned, were also insisted upon.

*Balch & DeYoe*, for respondents, insisted that the relators had a complete remedy at law, and that the Court could not interfere by mandamus.— 1 *N. Y.* 563; 18 *Pet.* 291; 1 *Kern.* 563; 5 *Hill*, 616; 2 *Barb.* 417; 4 *Met.* 73;

THE PEOPLE *v.* THE TOWNSHIP BOARD OF OVERYSSEL.

*People v. Judges of Branch Circuit,* 1 *Doug. Mich.* 319. And that the contract was invalid for the reasons stated.

*A. Russell,* for relators, argued that there was nothing in the law disqualifying members of the committee from becoming contractors; that the township of Overyssel being fully represented in the Harbor Committee when the contract was let, was estopped from asserting its invalidity because of members of the committee being among the contractors: that it was not competent to sue the townships and collect by execution, as they were only authorized by the act to pay in bonds, and that in respect to the work, the four towns were to be regarded substantially as partners, so that it was competent for one town to adjust and liquidate the account of the relators, who were creditors of the partnership, by accepting the work at the contract price, as Holland did.

MANNING J.:

Four of the relators, who took the contract to build the piers, were members of the board of freeholders organized under the act for the purposes therein mentioned, and that let the contract on behalf of the public. So careful is the law in guarding against the abuse of fiduciary relations, that it will not permit an agent to act for himself and his principal in the same transaction, as to buy of himself, as agent, the property of his principal, or the like. All such transactions are void, as it respects his principal, unless ratified by him with a full knowledge of all the circumstances. To repudiate them he need not show himself damnified. Whether he has been or not is immaterial. Actual injury is not the principle the law proceeds on in holding such transactions void. Fidelity in the agent is what is aimed at, and as a means of securing it, the law will not permit the agent to place himself in a situation in which he may be tempted by his own private

interest to disregard that of his principal. Hence, the law will not permit an administrator to purchase at a public sale by himself, property of the estate on which he has administered; or a guardian the property of his ward, when sold by himself. All public officers are agents, and their official powers are fiduciary. They are trusted with public functions for the good of the public; to protect, advance and promote its interests, and not their own. And, a greater necessity exists than in private life for removing from them every inducement to abuse the trust reposed in them, as the temptations to which they are sometimes exposed are stronger, and the risk of detection and exposure is less. A judge cannot hear and decide his own case, or one in which he is personally interested. He may decide it conscientiously and in accordance with law. But that is not enough. The law will not permit him to reap a personal advantage from an official act performed in favor of himself. For these reasons, we hold the contract we are asked to enforce by mandamus, void as against public policy.—See *Clute v. Barron*, 2 *Mich.* 192; *Dwight v. Blackmar*, 2 *Mich.* 330; *Ingerson v. Starkweather, Walk. Ch.* 346; *Beaubien v. Poupard, Har. Ch.* 206; *Walton v. Torrey, Har. Ch.* 259; *Perkins v. Thompson*, 3 *N. H.* 144; *Obert v. Hammel*, 3 *Harrison (N. J.)* 74; *Lazarus v. Bryson*, 3 *Bin.* 54.

We think it no exception to the rule we have stated, that all the contractors were not members of the board of freeholders, or that those who were members were a minority of the board. The rule would not amount to much if it could be evaded in any such way. It might almost as well not exist, as to exist with such an exception. The public would reap little or no benefit from it.

Being against the relators on this part of the case, I think it unnecessary to notice the other points made on the argument.

The mandamus, I think, should be denied, with costs.

THE PEOPLE v. THE TOWNSHIP BOARD OF OVERYSSEL.

CHRISTIANCY J.:

I concur with my brother Manning in holding the contract void, for the reason that it was taken by a part of the same public officers or agents who had been appointed under the law to let it, and who, as such officers, participated in letting the same contract which they assumed to take in their individual capacity.

As public officers, it was their duty in making the contract to act solely for the public interest, without reference to their own; not only as to the price to be given for the work, but in adopting the plan and specifications, and in the mode and time of performance: as individuals, in taking the contract, they must naturally (and while human nature remains unchanged, we may almost say, necessarily) seek to adopt the plan, and to make the terms most conducive to their own interests. The public were entitled to their best judgment, unbiased by their private interests, and by accepting the office they became bound to exercise such judgment, and to use their best exertions for the public good, regardless of their own. They had no right, while they continued in office, to place themselves in a position where their own interests would be hostile to those of the public.

The fact that those contractors did not constitute a majority of the joint boards of the several townships (though they were a majority of that of their own township), I do not regard as in any respect altering the principle; nor the fact that the contract was let to the lowest bidder. The price alone is but one element embraced in the question, and even this might be affected by their influence, by fixing the time and place of the letting, by their right to decide upon the responsibility of the bidders, and by many other circumstances, over which, as members of the board, they might exercise an influence. But, the plan of the work, the materials to be used, and the

mode and time of completion, might all be influenced by the individual interests of these men, and determined, in a way which would effectually exclude a fair competition in bidding. And, they would, of course, have a voice in determining upon the mode in which the work was afterwards done under the contract, and in its acceptance. In all these matters, the influence of these contractors would not only be given by their own votes, but, as all the members must be supposed to be more or less influenced by them, though but a minority, they may determine the majority; and, it is manifestly impossible, from the nature of the case, to ascertain and measure the amount of their influence upon the board, or in what manner it may have affected the action of the other members, or ·what would have been the determination of the majority without that influence; the members themselves could neither state nor know it.

And, though these contractors may, as members of the board, have acted honestly, and solely with reference to the public interest, yet if they have acted otherwise, they occupy a position which puts it in their power to conceal the evidence of the facts, and to defy detection. If, therefore, such contracts were to be held valid, until shown to to be fraudulent or corrupt, the result, as a general rule, would be, that they must be enforced *in spite of fraud or corruption.* Hence, the only safe rule in such cases, is to treat the contract as void, without reference to the question of fraud in fact, unless affirmed by the opposite party. This rule appears to me so manifestly in accordance with sound public policy as to require no authority for its support.

CAMPBELL J.:

While I concur in holding that this is not, upon the facts presented, a proper case for a mandamus, I do not agree with my brethren in their view of the invalidity of

the contract. The Harbor Committee entrusted with the work consisted of twenty-eight members — seven from each township — and was a separate corporate body, acting by vote. The law required the contract for the harbor improvements to be given to the lowest responsible bidder; and those members of the committee who were with other persons successful bidders for the contract, were a minority, whose vote was not essential, and could not have changed the result, which was one of figures and computation.

The opinion of my brethren is based upon the rule, which prevents certain persons occupying fiduciary relations, from dealing, for their own benefit, with the funds under their care. It it a well settled principle that the same person cannot be vendor and purchaser, because his contract lacks the necessary element of two parties; neither can a trustee become interested to the detriment of his *cestui que trust*, or an agent to the detriment of his principal. Even these contracts, however, are not universally void. They are usually voidable at the option of the party defrauded or affected, but they are not absolutely void, except where, by reason of the identity of vendor and vendee, a contract is in the eye of the law impossible. And, where the injured party elects to avoid them, he must in general, make such compensation as will place the trustee in *statu quo*.—See the cases collected in 1 *Lead. Cas. in Eq.* 157, 167, 168.

So far as I have been able to ascertain from the authorities, this doctrine is confined to cases of the purchase of property; and has been maintained on the principle that by such a purchase a trust is made to attach, which in equity creates a beneficial interest in favor of the *cestui que trust*. And although it is doubtless true that contracts between parties in a fiduciary relation will be closely criticised, I find no rule of nullity affecting them merely as contracts.

On the contrary, in all cases of corporations, public and

private (for no distinction is made in the books, and none exists in reason between them), it is a familiar principle that they may contract as freely with one individual as with another; and that there is no legal identity between the corporate body and its individual members or officers, in their private capacity. The only exception seems to be the one already referred to, where the corporation cannot act at all without the action of some particular person, who is thereby disqualified from dealing with himself, and who, of course, cannot contract with himself.— 1 *Kyd on Corp.* 180, 181; *A. & A. on Corp.* § 233. In other cases, and where the contract may be made on behalf of the corporation, without the assistance of a particular member or officer, a contract with him is as valid as if he were a stranger. — *Stoddert v. Vestry of Port Tobacco*, 2 *Gill & J.* 227; *Geer v. School District No. One in Richmond*, 6 *Vt.* 76; *Sawyer v. Methodist Ep. Society in Royalton*, 18 *Vt.* 405; *Rogers v. Danby Universalist Society*, 19 *Vt.* 187; *Albright v. Chester*, 9 *Rich. Law*, 399; *Proprietors of Canal Bridge v. Gordon*, 1 *Pick.* 297. This last case is a somewhat singular exemplification of the rule, for there the same persons were officers of the different corporations, and the corporations contracted with each other by their action. It is also in point, upon some of the questions on the contract before us, inasmuch as acquiescence in a certain course of things was held to imply assent.

It is not suggested anywhere, that public agents labor under more disqualifications than private agents. The whole doctrine, so far as it has been carried at all, originated in private trusts and agencies. The cases cited embrace all kinds of corporations, public as well as private. So far as private corporations are concerned, transactions with their own officers are of every day occurrence. The laws sometimes, as in the charters of many banks, limit the extent of such bargains, but never, or rarely, forbid them. In municipal corporations we frequently find statu-

tory provisions, forbidding the letting of contracts to officers of the municipality. Such statutes would be needless, if the general rules of law forbade it. And, in small and new townships, forbidding such contracts would be equivalent to shutting the best men out from office. Works of enterprise, in such localities, cannot usually find many bidders. The evils have not been found very serious, and the Legislature can easily provide for them when they are supposed to need redress. I think it safe to leave the [subject for such action, instead of adopting a rule, which, if carried to its legitimate consequences, would cripple many of the largest enterprises in the country. By providing that contracts shall be let to the lowest bidder, the law has adopted as effectual means of protection as the other rule is likely, in such cases as the present, to ensure to the townships interested. I see nothing in this case to invalidate the contract.

I think, however, that the controversy should be adjusted by an action at law or suit in equity. There are several questions in controversy, and among others the inquiry arises whether the work has been done as agreed. There has been no acceptance shown beyond dispute, and there is nothing before us to bind any parties to the payment of a liquidated amount not subject to reduction. The action of the board of Holland is not, as the case stands before us, conclusive upon the rest. The whole matter is in such a shape that it cannot lawfully, as I think, be taken from the cognizance of the ordinary tribunals. For this reason I concur in refusing a mandamus.

*Mandamus refused.*

Martin Ch. J. did not sit in this case.